

FILED

FEB 2 1 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

Quinton Joey Watts
_____
(Name of Plaintiff)
North Kern State Prison
_____
(Address of Plaintiff)
P.O. Box 5000/Delano, Calif 93216
_____

vs.

Simon Hamann
_____

_____

_____
(Names of Defendants)

2:17-CV-0379 KJN
_____
(Case Number)

COMPLAINT

I. Previous Lawsuits:

    A. Have you brought any other lawsuits while a prisoner: ☒ Yes    ☐ No

    B. If your answer to A is yes, how many?: __2__ Describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper using the same outline.)

        1. Parties to this previous lawsuit:

        Plaintiff Quinton Joey Watts
_____

        Defendants Taymour E Malik MD.
_____

FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983

Rev'd 5/99

1

2. Court (if Federal Court, give name of District; if State Court, give name of County)

_Eastern District_

3. Docket Number _6 (no document attached)_

4. Name of judge to whom case was assigned _John A Mendez_

5. Disposition (For example: Was the case dismissed? Was it appealed? Is it still pending?)
_it is still pending_

6. Approximate date of filing lawsuit _May 3-2016_

7. Approximate date of disposition _____

II. Exhaustion of Administrative Remedies

A. Is there a grievance procedure available at your institution?   ☐ Yes   ☒ No

B. Have you filed a grievance concerning the facts relating to this complaint?
☐ Yes   ☒ No

If your answer is no, explain why not _____

C. Is the grievance process completed?   ☐ Yes   ☐ No

III. Defendants

(In Item A below, place the full name of the defendant in the first blank, his/her official position in the second blank, and his/her place of employment in the third blank. Use item B for the names, positions and places of employment of any additional defendants.)

A. Defendant _Simon Hamann_ is employed as _Investigator For The Mait Team, For The Highway Patrol_ at _100 E Street, Williams, California 95987_

B. Additional defendants _____
_____
_____
_____
_____
_____

2

IV.   Statement of Claim

(State here as briefly as possible the facts of your case.  Describe how each defendant is involved, including dates and places.  Do not give any legal arguments or cite any cases or statutes.  Attach extra sheets if necessary.)

The Fact is on The Mait Team Transcripts pages 487-490 Clearly Shows That investigator Simon hamann Told me I was having Seizures and he was asking me what Caused These Seizures. So investigator hamann intentionaLLy withheld exculpatory evidence. he also gave plenty of False evidence To Support The prosecutor. pg. 55-74, pg. 300-354

ATTached; Documantation of Facts, and Legal arquements

V. Relief.

(State briefly exactly what you want the court to do for you.  Make no legal arguments.  Cite no cases or statutes.)

That my Case be reopened To Clear up all The Factbound errors in my Conviction, and That Charges be brought againtst This high- way patrol officer, also Monetary Compensation

Signed this ___25___ day of ___October___, 20_16_.

_Quinton Watts_
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

_10/25/2016_
(Date)

_Quinton Watts_
(Signature of Plaintiff)

3

Case 2:09-cv-03019-MCE-RJN   Document 1   Filed 02/2/11   Page 4 of 87

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME (2400) | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 487 |

**Statement of Quintin Joey Watts** (continued)

*On Monday, December 15, 2008, at approximately 1130 hours, Investigator Hamann conducted a telephone interview with Quintin Watts. The purpose of the interview was to ask clarifying questions about Watts' prior medical history. Watts' medical records had been obtained after he signed a release of medical records/information. At no time during the conversation did Watts withdraw his consent of the release for the medical records/information. The following transcription of this interview was completed by Investigator Parsons. Extraneous words, such as "uh, um," and repeated words are not included, unless the words changed the meaning of the statement. The audio file of this interview will be retained by the CHP Williams Area.*

> SH:    Investigator S. Hamann
> QW:    Quintin Watts

*Investigator Hamann telephoned a number at DVI, and an unidentified employee answered the telephone.*

Unknown: Portis.

SH:    Hey, it's Simon.

Unknown: Alright Simon, I'm going to put you on handset free and I'm gonna close the door.

SH:    Okay, thanks.

Unknown: Okay, he's here.

*The employee brought Watts to the room to conduct the telephone interview.*

SH:    Hey Quintin?

QW:    Yes.

SH:    Hey, it's Simon Hamann, we talked last week.

QW:    Oh, yes.

SH:    Hey I just wanted to call and say that, hey thanks for signing that paperwork. We got the medical records and stuff and I wanted to follow-up to see if you had any questions for me.

QW:    Not really, well I did, was wondering when they were gonna, like, release my wallet or stuff or, you know, how long that was gonna be before they did that, release my money.

2:16-cv-00379-MCE-KJN   Document 1   Filed 02/21/17   Page 5 of 87

| DATE OF COLLISION (MONTH-DAY-YEAR) | TIME (2400) | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 488 |

**Statement of Quintin Joey Watts** (continued)

SH:  Okay, I don't have that answer off the top of my head, but I will check into that right after I get off here, and so I think by the time you get ready to get out of there that should not be a problem.

QW:  Okay, alright.

SH:  And we got the records from Doctor Malak.

QW:  Uh huh.

SH:  I had a few questions on that if you don't mind.

QW:  No.

SH:  What can you tell me about the seizures you were suffering back in 2007?

QW:  I had one, a seizure back in 2007, why I had it I really don't know.  I know it, I lost a lot of memory behind it though, but that's about it.

SH:  What, what, do you remember what the, your symptoms were when you were having the seizure?

QW:  No, not at all.  Like I said I lost a lot of memory.

SH:  Okay.  Was Colene with you when you had the seizure?

QW:  I'm not, I think so.

SH:  Do you remember what she said that happened to you while you were having the seizure?

QW:  No.

SH:  And so you went and saw Doctor Malak about that, right?

QW:  Yeah.

SH:  And what did he kinda prescribe for you to do?

QW:  Nothing out of the, nothing out of the abnormal, I mean, I was just still on the same medication, nothing really different.

SH:  Okay, and did they ever figure out why you were having the seizures?

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 489 |

### Statement of Quintin Joey Watts (continued)

QW: No, it was just one that I had. They never really told me or said anything to me about why it occurred, I guess maybe my blood sugar got too high or something, or, I'm not sure.

SH: Okay, looking at the records there it says that you came back in on, in March or something like that and that you were very upset because something hadn't, nothing had been done with the seizure. Why were you upset?

QW: I came back in and I was very upset?

SH: Uh huh.

QW: To the doctor's office?

SH: Yeah.

QW: Jesus, I don't know Mr. Simon I couldn't even…

SH: Okay.

QW: I couldn't tell you.

SH: And then do you remember like this last March you went back into the doctor's office?

QW: Last March…last March. I, I'm not sure why I, I usually go back to the doctor's office to get refills, or one time I went to get some kind of those, what do you call those pills for sexual thing, I don't know, but it wasn't nothing major I don't think.

SH: Okay. I think it was when you went in to get your medical record. I mean, not your medical record, but you get your medical card for your commercial license.

QW: Yeah, okay.

SH: Do you remember what you guys discussed then as far as the seizures were?

QW: No, I don't think so. I don't think, I don't remember Mr. Simon what we discussed, but they gave me my medical card, so obviously, I mean, it wasn't, whatever happened wasn't that serious.

SH: Okay. Do you remember telling him that the reason that you were having the seizures is 'cause you were drinking and taking drugs?

| DATE OF COLLISION *(MONTH-DAY-YEAR)* | TIME *(2400)* | NCIC | OFFICER I.D. | NUMBER | PAGE |
|---|---|---|---|---|---|
| 10-05-2008 | 1810 | 9155 | 16161 | 08-10-06 | 490 |

### Statement of Quintin Joey Watts (continued)

QW: No, I don't remember telling him that.

SH: Okay. And kinda going back to, before the crash on Saturday and Sunday.

QW: Uh huh.

SH: Do you remember what you were doing on the trip in the morning on Sunday, when, I think it's, what's her name, Elaina, was driving?

QW: Do I remember what I was doing?

SH: Yeah.

QW: When Elaina was driving, Saturday morning?

SH: Yeah.

QW: I don't think I was doing anything different than I usually do, sit there and watch, and, or maybe eat or something like that.

SH: Okay. So you weren't like laying down in the back trying to get some sleep while she was driving?

QW: That Sunday morning, I might have, I don't know.

SH: Okay. So you just don't really remember what was going on?

QW: Not, not really. I mean, you know, not to, not, no I don't think it was anything that really I did that, that…

SH: Okay. No, I know it's been a little while, so, alright. And any, anything else that you can think of, any questions I can answer for you? I'll take a look into that wallet when we're gonna release all that, and it should be, we should be done with that by the time you're getting ready to get out. Is it still the 12th or the 14th that you're supposed to be getting out?

QW: According to them it still the 12th, so, you know, I don't, they haven't changed it, but when the 12th comes and I'm ready to go out they might change it then.

SH: Okay. Okay, so any other questions for me?

QW: No, that's it.

after The bus accident, I was Taken To The hospital For emergency Service. I was at woodland Memorial hospital For almost a month or more. I went Through a Few operations and Medical Services. While I was at The hospital The Mait Team Came To question me on Several Thing's, and on many of These day's I was still heavily medicated. also during this time They would make my ex wife Leave From Visiting me. also at this Time I was not Sure what happen, So The statements They got From me, was not From a person who knew what I Caused That accident To occur. They asked me if I would release my Medical records To Them and I agreed. Later on investigator Hamann Came back asking about my Medical records. he asked me why was I having Seizure's, This was Some Thing I didn't even Know of. My primary doctor never Told me I was having Seizure's, in Fact my doctor was The one who Cleared me Medically Through DMV To get my Class A License. So I Feel That my Medical records Should have been Brought up in my defense. during my whole Court Session I did not remember about me having Seizure's, it took me until 2013 and many black out's in prison to Find out I have Seziure's. Thats because I didn't start having Seizure's until 2006 when I was Jump and Stomped in The head and Left For dead. my ex wife said she use To take Care of me Like one of are Kids, Thats how bad I was. My doctor was not Telling me how bad I was or what he Thinks is happening to me. The Colusa-Sun-herald shows That Mr Hamann Lied when he stated That I Told investigators I once had a Seizure That occured more Than a year ago. when They questioned me, I didn't even Know I had Seizures

Print Story | E-Mail Story | Font Size ⊡ ⊠ ⊠ ⊠          Games



Colu

# Bus driver held over for trial

Friday, Jul 31 2009, 8:43 pm

By Rob Parsons/Staff Writer

The driver involved the fatal October bus crash in Colusa County will be held to answer on all charges, a judge ruled Friday.

Quintin Joey Watts, 53, of Stockton, has pleaded not guilty to 11 counts of vehicular manslaughter and two traffic violations stemming from the Oct. 5, 2008 crash on rural Lonestar Road.

At his preliminary hearing, investigators from the California Highway Patrol testified that weather and road conditions were not factors in the crash and the bus was mechanically sound.

CHP Officer Simon Hamann said Watts told investigators he had fewer than five hours of sleep in the 48 hours leading up to the crash.

"That's a lie," Watts challenged loudly. "Sitting up there lying like that, man. That's a lie."

Judge John H. Tiernan scolded Watts harshly for speaking out of turn.

Hamann went on to testify that Watts, who suffers from diabetes, had not been consistently checking his blood sugar levels prior to the crash. He said Watts had only eaten one fast-food meal that day and had also drank a bottle of juice, which normally causes his blood sugar to spike.

"He said when his blood sugar is too high, it makes him sleepy," Hamann testified.

Watts also told investigators he was once treated for a seizure he claimed occurred more than a year before the crash.

Watts has a valid commercial driver's license, but was still training to be cleared to drive passengers unsupervised. Hamann said Watts was paid $35 by his stepfather and bus owner, Daniel Cobb, who was killed in the crash. That sum would have doubled when Watts completed his training, Hamann said.

"He said he shouldn't have gone on the trip and stayed home," Hamann said, "but, he said he needed the money because he has three kids at home."

Investigators said there was no evidence of brake use at the crash site, leading investigators to conclude Watts likely fell asleep moments before the crash.

"A conscious driver would be expected to apply the brakes?" defense attorney Albert Smith questioned.

"Yes," Hamann replied.

David Markss, the Colusa County District Attorney's chief investigator, testified that multiple passengers said they saw Watts fall asleep moments before the crash.

Watts tried to dismiss his attorney twice. Watts told the judge that Smith had threatened him prior to Friday's proceedings.



**enlarge**

Quintin Joey Watts,

## Other Articles in this Category

× Council tables sewer rate decision
  38 minutes ago
× UPDATE: Bus crash trial set on anniversary
  2 hours & 48 minutes ago
× Colusa state park in limbo
  1 hour & 47 minutes ago
× Kittle named city clerk
× Former Colusa County exec out in Glenn

## Most Viewed Stories

× Colusa prosecutor arrested
× Kittle named city clerk
× Former Colusa County exec out in Glenn
× Colusa native called a hero
× Police Logs: August 15, 2009

## Most Commented Stories

× Colusa prosecutor arrested
× Citizens reveal finances
× Snow Mountain fire simmers
× Stink on sewer fee hike rising; residents say its unfair
× 'Joy ride' ends in crash, fire

## Save & Share this Article  What is this?

Digg                              Google

StumbleUpon                       del.icio.us

Facebook                          Newsvine

Reddit                            Slashdot

(1a) In Brady V. Mary Land, Supra 373 U.S. 83, 87 [10 L. Ed. 2d 215, 218-219], The united States Supreme Court held The Suppression by The prosecution of evidence Favorable To an accused upon request Violated due process where the evidence is Material either To guilt or to punishment; irrespective of The good Faith or bad Faith of The prosecution. The standard of review For alleged Violations of brady is whether "There is a reasonable probability that, had The evidence been disclosed To The defense, The result of The proceeding would have been different. United States V. Bagley, 473 U.S. 667, 682, 105 S. Ct 3375, 87 L. Ed 2d 481 (1985) In Sum, For a Brady Claim To Succeed, (1) The evidence at issue must be Favorable To The accused, either because it is exculpatory or impeaching; (2) That evidence must have been Suppressed by The prosecution, either willfully or inadvertently; and (3) prejudice must have ensued. Banks V. Dretke 540 U.S. 668, 691 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004); Strickler V. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1934, 144 L. Ed. 2d 286. The giving of False evidence is a Violation of Penal Code as well as a Violation of due process.

This is The Court Transcripts of A Simon Hamann

1    you're currently employed?

2    A.    Yes.   The California Highway Patrol.

3    Q.    And how long have you been a California

4    Highway Patrol officer?

5    A.    Over 12 years.

6    Q.    Can you tell us what your current

7    assignment is as a Highway Patrol officer?

8    A.    Yes.   I'm an investigator with the Northern

9    Division Multidisciplinary Accident

10   Investigation Team.

11   Q.    Is that commonly referred to as the

12   M.A.I.T. team I think we've heard?

13   A.    Yes.

14   Q.    And I take it that you're assigned to the

15   same team as Investigator Parsons who just

16   testified; is that correct?

17   A.    Correct.

18   Q.    Now, Investigator Parsons told us about

19   some specialized training that the California

20   Highway Patrol requires before you can become a

21   M.A.I.T. investigator.   Are you familiar with

22   that training that I'm speaking of?

23   A.    Yes, I am.

24   Q.    Okay.   And have you been through the same

25   general types of training in the course of your

000300

1    being made an investigator with the M.A.I.T.

2    team?

3    A.    Yes.    I initially went through the initial

4    accident reconstruction training in 2002.    I've

5    been doing reconstruction with the Highway

6    Patrol either on a part-time or full-time basis

7    since then.

8    Q.    Okay.    Investigator Hamann, I would like to

9    take you back to October 5th of 2008, last year,

10    during the early evening hours roughly between

11    6:00 p.m. and 9:00 p.m..    On that date at that

12    time were you assigned to go to the scene of a

13    crash on Lone Star Road about one and a half

14    miles north of Abel Road here in Colusa County?

15    A.    Yes.

16    Q.    And did you arrive at the scene at

17    approximately 9:00 p.m. with other members of

18    the northern division M.A.I.T. team?

19    A.    Yes.

20    Q.    Now, as part of your investigation or as

21    part of your role in this investigation,

22    Investigator Hamann, did you interview various

23    people who had been involved in the traffic

24    collision?

25    A.    Yes.

1    Q.    And specifically did you interview Quintin

2    Joey Watts?

3    A.    Yes.

4    Q.    And do you see Mr. Quintin Joey Watts in

5    the courtroom today?

6    A.    I do.

7    Q.    Can you tell us where he's seated, please.

8    A.    Sitting on the far -- my right-hand side of

9    the table in front of the Court.

10              MR. DATIG:  May the record reflect,

11   Your Honor, the witness has identified the

12   Defendant?

13              THE COURT:  It will so reflect.

14              MR. DATIG:  Thank you.

15   Q.    And did you, in part of your investigation,

16   interview the Defendant, Quintin Watts?

17   A.    Yes.

18   Q.    And did you speak with him on more than one

19   occasion?

20   A.    Yes, I did.

21   Q.    Now, I would like to take you to Thursday,

22   October 8th of 2008 at Woodland Memorial

23   Hospital and ask you if you participated in an

24   interview of the Defendant on that date at that

25   location with Investigator Nate Parsons.

1   A.    Yes.

2   Q.    Is it fair to say Investigator Parsons

3   conducted part of the interview, and then you

4   conducted a different part of the interview?

5   A.    Correct.

6   Q.    Now, your part of the interview, did you

7   speak with the Defendant about his activities

8   and work hours for a period of time prior to the

9   collision actually occurring?

10  A.    Yes.

11  Q.    Is there a specific -- particular term that

12  the M.A.I.T. team refers to in terms of

13  obtaining information about what someone was

14  doing and what their activities were leading up

15  to a traffic collision?

16  A.    Yeah.  We call that the precollision

17  profile, goes back for a period of time before

18  the collision, but also goes into a person's

19  history as far as training they've received and

20  their driving the vehicle.

21  Q.    Okay.  And Investigator Parsons told us

22  that this interview was recorded and

23  transcribed; is that your recollection?

24  A.    Yes.

25  Q.    And in fact do you have a copy of the

1    transcript with you in court today?

2    A.    I do.

3    Q.    In case you need to refer to it .

4    accuracy?

5    A.    Yes.

6    Q.    Now, Investigator Hamann, during your

7    portion of the interview, did Mr. Watts indicate

8    to you whether or not the passengers who were on

9    this bus paid -- or the passengers who rode the

10   Cobb Coaches buses, either to Thunder Valley or

11   Colusa, whether or not they paid a fee to ride

12   the bus to the casino?

13   A.    Yes.

14   Q.    Did he tell you how much it cost, if you

15   recall?

16   A.    Yes.  It was $6 for a round-trip ticket

17   from Sacramento to Colusa Casino and back, it

18   was $4 for one to Thunder Valley Casino.

19   Q.    Now, you mentioned to us about obtaining

20   information for the precollision profile.  Did

21   you speak with the Defendant about his

22   activities on Friday, October 3rd, which would

23   have been the Friday before the day on which

24   this collision occurred which was a Sunday?

25   A.    Yes.

1    Q.    And specifically did you discuss with h

2    what his work hours were?

3    A.    Yes.

4    Q.    For Cobb -- I'm sorry, for Cobb's Coaches

5    on that day?

6    A.    Yes.

7    Q.    And did Mr. Watts tell you how long or what

8    hours he had worked on Friday, October 3rd?

9    A.    Yes.

10   Q.    And what did he tell you?

11   A.    That he had to be in Sacramento at 7:30,

12   and then picked up passengers, went to Thunder

13   Valley Casino, returned and dropped off the

14   passengers and was done working around 1:30 or

15   2:00 in the afternoon.

16   Q.    And that was a round -- round trip to

17   Thunder Valley that day; is that correct?

18   A.    Correct.

19   Q.    Now, did Mr. Watts tell you what he did

20   after he drove home to Stockton -- I'm sorry,

21   after he got off work that day when he was done

22   at 1:30 or 2:00 in the afternoon?

23   A.    Yes.  He said he went home to Stockton.

24   Q.    Okay.  And about how long did he tell you

25   that it takes or that it took for him to drive

000305

1    from the bus yard in Sacramento or the drop-off

2    area in Sacramento where he got off work to his

3    home in Stockton?

4    A.    He said it took about 45 minutes.

5    Q.    Did Mr. Watts tell you whether or not

6    he had dinner at home that day?

7    A.    Yes.

8    Q.    And did he tell you about what time he had

9    dinner?

10   A.    Yes.

11   Q.    What time did he indicate?

12   A.    4:30 or 5:00 in the evening.

13   Q.    Did Mr. Watts tell you what time he went to

14   bed on Friday evening?

15   A.    Yes.  He said he went to bed at 9:00

16   o'clock in the evening.

17   Q.    Now, did Mr. Watts describe for you in any

18   way how he slept?  And when I say how he slept,

19   I don't mean what position he slept in, but

20   whether or not he had any issues or problems

21   or -- or other challenges perhaps with sleeping

22   that evening?

23   A.    He described his sleeping as being restless

24   and that he was tired the next morning.

25   Q.    Did Mr. Watts, taking you forward now,

1    okay, Mr. Watts has gone to bed on Friday

2    evening at about 9:00 o'clock, sleeps

3    restlessly, did you then go forward to Saturday

4    morning, October 4th with him?

5    A.    Yes.

6    Q.    And did Mr. Watts tell you about what time

7    he got up, got out of bed Saturday morning,

8    October the 4th?

9    A.    He said he got up around 4:00, 4:30 in the

10   morning.

11   Q.    4:00 or 4:30 in the morning?

12   A.    Yes.

13   Q.    And did Mr. Watts tell you approximately

14   what time he arrived for work at Cobb's Coaches

15   that morning in Sacramento?

16   A.    7:00 o'clock in the morning.

17   Q.    Now, what, if anything, did Mr. Watts tell

18   you about any casino trips that he took on

19   Saturday, specifically Saturday morning?

20   A.    He made the normal morning run to Thunder

21   Valley Casino and then back to the yard.

22   Q.    Did Mr. Watts tell you about what time they

23   got back to the yard -- and that's the yard in

24   Sacramento; is that correct?

25   A.    Correct.

000307

1    Q.    About what time they got back to the yard

2    on Saturday after making that morning run to

3    Thunder Valley?

4    A.    Around 2:00 or 2:30 in the afternoon.

5    Q.    Now, did Mr. Watts tell you about another

6    casino run that was made a bit later in the day

7    on Saturday?

8    A.    Yes.   There was a casino run to Colusa

9    Casino that evening.

10   Q.    And what time did Mr. Watts tell you that

11   they left with the bus to make that trip to

12   Colusa Casino?

13   A.    Around 4:00 in the afternoon they left the

14   yard there to begin picking up passengers to the

15   run to Colusa Casino.

16   Q.    And did the Defendant tell you who was

17   driving the bus for that Colusa Casino run in

18   the afternoon?

19   A.    Mr. Cobb was driving from the location

20   where the pickups were at, and then once they

21   got to the last pickup or before they got on the

22   freeway to head towards Colusa Casino, Mr. Watts

23   took over and drove from there to Colusa Casino.

24   Q.    And did the Defendant tell you whether or

25   not Mr. Cobb remained on the bus?

000308

1    A.    Yes.  He stayed on the bus.

2    Q.    Was it your understanding from this

3    interview with the Defendant, of both your

4    portion and as well as the portion you were also

5    present for with Investigator Parsons, that

6    during this period of time the Defendant was in

7    training as a driver?

8    A.    Yes.  That's what he had told us.

9    Q.    Now, once the bus arrived at the Colusa

10   Casino after leaving the yard at about 4:00

11   o'clock that afternoon, did Mr. Watts tell you

12   what, if anything, he did once he got to the

13   Colusa Casino?

14   A.    As -- when they got to the Colusa Casino,

15   they got a $15 play card where they could gamble

16   for $15, and they also got a buffet dinner card

17   or buffet card, so he walked around, gambled his

18   $15, and then he ate at the buffet.

19   Q.    Did the Defendant tell you what, if

20   anything, Mr. Cobb did during this period of

21   time?

22   A.    Mr. Cobb went back to the bus, and in a

23   compartment area underneath the bus there they

24   had set up sort of a make-shift place where they

25   could lay down and sleep.  There was a mattress,

1    I believe, and sleeping bags underneath there

2    where he laid down and took a nap.

3    Q.    So Mr. Cobb took a nap, and the Defendant,

4    Mr. Watts, walked around, gambled, had something

5    to eat; is that correct?

6    A.    Correct.

7    Q.    Did the Defendant tell you about what time

8    the bus departed from the Colusa Casino to

9    return to the Sacramento area that night?

10   A.    About 1:00 o'clock in the morning.

11   Q.    So that actually would have been 1:00

12   o'clock in the morning on Sunday morning; is

13   that correct?

14   A.    Correct.

15   Q.    And did the Defendant tell you who drove

16   the bus back?

17   A.    Mr. Cobb drove the bus back.

18   Q.    Now, did the Defendant tell you whether or

19   not he got any sleep on the trip back from the

20   Colusa Casino departing about 1:00 in the

21   morning on Sunday?

22   A.    No.  He did not sleep.

23   Q.    Did the Defendant tell you -- now, based on

24   your interview with the Defendant, did you talk

25   to him about once the bus returned to Sacramento

000310

1   having to drop off passengers at various

2   locations before returning to the yard?

3   A.    Yes.

4   Q.    And he indicated to you that that's what he

5   did; is that correct?

6   A.    Correct.  He wasn't sure what order that

7   they dropped the passengers off, but they

8   dropped off -- got dropped off at the same

9   places they were picked up.

10   Q.    And did the Defendant then indicate to you

11   approximately what time the passenger drop-offs

12   were finished on Sunday morning and he was

13   actually able to leave work?

14   A.    2:30 or 3:00 in the morning.

15   Q.    Did the Defendant tell you what he did

16   after he got off work at 2:30 or 3:00 in the

17   morning?

18   A.    He went home to go to sleep.

19   Q.    Did he tell you about what time he actually

20   arrived home?

21   A.    3:00 something, close to 4:00.

22   Q.    And did he tell you what time he got up to

23   go back -- back to work on Sunday morning?

24   A.    5:00 o'clock in the morning.

25   Q.    What time was he due back at work that

1    morning, did he tell you?

2    A.   6:00 -- 7:30 in the morning.

3    Q.   Now, do you recall Investigator Parsons --

4    I'm going to ask you for some specific words

5    here.  Do you recall Investigator Parsons asking

6    the Defendant, I refer you, I believe to page

7    421 of your transcript, Investigator Parsons

8    asking the Defendant, so you slept for an hour;

9    do you remember that question?

10   A.   Yes.

11   Q.   And what was the Defendant's response to

12   that question?

13   A.   His exact words, "Told you I was tired,

14   man."

15   Q.   Now, you told us based on your interview

16   with the Defendant, which was recorded and

17   transcribed, you told us and Investigator

18   Parsons told us based on his questions in your

19   presence that the Defendant got up on Saturday

20   morning about 4:00 to 4:30 -- or I'm sorry,

21   between Saturday morning about 4:00 to 4:00 --

22   4:00 to 4:30 a.m. and Sunday morning at 7:30

23   a.m. when he got back to the yard in Sacramento,

24   okay.  Are you following me so far?

25   A.   Yes.

000312

1    Q.    Okay.   How many hours would that be between

2    his 4:00 to 4:30 a.m. on Saturday morning and

3    7:30 a.m. on Sunday morning?

4    A.    Twenty-seven to 27 and a half hours.

5    Q.    And based on the Defendant's statement to

6    you, before he said "Told you I was tired, man,"

7    according to his own statement about how many

8    hours of sleep had he had during that 27-hour

9    period?

10   A.    One to maybe one and a half hours.

11   Q.    Now, let's talk about what the Defendant

12   told you about his activities on Sunday, October

13   5th.   I think you told us that he told you he

14   got back to work about 7:30 in the morning in

15   Sacramento on Sunday, October 5th, the day of

16   the collision; is that correct?

17   A.    Correct.

18   Q.    Now, did the Defendant tell you whether or

19   not he went on a casino run that morning?

20   A.    Yes, he did.

21   Q.    Where did he tell you he went?

22   A.    Thunder Valley Casino.

23   Q.    And did he tell you whether or not he was

24   driving on that run or not?

25   A.    No.   It was one of the other drivers of

1   Cobb's Coaches, his stepsister Elaina.

2   Q.   And did he tell you he was riding as a

3   passenger on that run?

4   A.   Yes.

5   Q.   During the course of his training I assume?

6   A.   Correct.

7   Q.   Okay.  Did he characterize for you, and I'm

8   specifically referring to page 423 of the

9   transcript, did he tell you how he was feeling

10   during the course of that run to Thunder Valley

11   that morning?

12   A.   That he was tired.

13   Q.   In fact, were his words, "The whole time I

14   was tired"?

15   A.   Those were his words, yes.

16   Q.   Now, once the bus arrived at Thunder

17   Valley, did the Defendant tell you what, if

18   anything, he did?

19   A.   He stayed on the bus, he got some rest.

20   Q.   Did he tell you how much rest he got, in

21   fact, did you talk about whether he slept or

22   not?

23   A.   Yes.  I'm trying to question him about how

24   much sleep he was able to get on the bus.

25   Q.   And according to him, how much time or how

000314

1    much sleep time, how many hours of sleep was he

2    able to get there on the bus at the Thunder

3    Valley Casino that morning?

4    A.    Maybe one and a half to two hours were his

5    words.

6    Q.    Did he tell you at what time the bus left

7    the casino, left Thunder Valley Casino that day?

8    A.    1:00 o'clock in the afternoon.

9    Q.    Now, during this time period at the Thunder

10   Valley Casino, did the Defendant indicate to you

11   whether or not he had eaten anything?

12   A.    No.   He stated that he had stayed on the

13   bus, and at Thunder Valley they got a discount

14   on a buffet in the morning.   And other days he

15   would normally eat there, but he said on Sunday

16   he stayed on the bus because he was tired and

17   tried to get some rest and did not eat.

18   Q.    Now, did the Defendant tell you where the

19   bus went after it left Thunder Valley to return?

20   A.    Back to the Sacramento area to drop off the

21   passengers.

22   Q.    And did Mr. Watts tell you that the bus,

23   after doing the passenger drop-off, returned to

24   the yard in Sacramento?

25   A.    Yes.

000315

1   Q.   Now, at that point did Mr. Watts tell you

2   whether or not he got anything to eat?

3   A.   Yes.  He said he went to Taco Bell and got

4   some food.

5   Q.   And during the course of the interview did

6   he tell you what kind of food he got?

7   A.   Yes.

8   Q.   What kind of food did he get?

9   A.   I believe it was an enchirito and two tacos

10  and a drink.

11  Q.   What kind of drink, did he tell you that?

12  A.   Mixed fruit drink.  He mixed some lemonade

13  with some fruit punch.

14  Q.   Did you specifically ask him, or was he

15  specifically asked whether or not he got diet

16  soda?

17  A.   Yes.

18  Q.   And he indicated he did not, instead got

19  the mixed fruit punch drink?

20  A.   Yes.

21  Q.   Now, once we're back at the yard, Mr. Watts

22  has had something to eat at Taco Bell or at

23  least picked up something to eat at Taco Bell,

24  did Mr. Watts tell you what, if anything, he did

25  once he's back at the yard?

000316

1    A.    He said he wasn't able to get any sleep,

2    but he tried to lay back, get some rest.

3    Q.    So he wasn't able to get any sleep, but he

4    tried to relax?

5    A.    Correct.

6    Q.    Now, was there another bus run to a

7    different casino that afternoon into the evening

8    hours?

9    A.    Yes.   There was going to be another trip to

10   Colusa Casino.

11   Q.    And did the Defendant tell you

12   approximately what time the bus left for that

13   run to the Colusa Casino?

14   A.    Approximately 4:00 o'clock.

15   Q.    Now, did he tell you who was driving the

16   bus on that run?

17   A.    He was driving the entire trip.   He drove

18   to pick up the passengers, and they continued on

19   towards the casino.

20   Q.    Now, in general terms, the route to the

21   Colusa Casino, did you talk with the Defendant

22   about what route he took from the area of the

23   city of Sacramento, downtown Sacramento to the

24   Colusa Casino?

25   A.    Yes.

1   Q.   And what did he tell you the route was?

2   A.   Northbound I-5 to the Hann Road exit and

3   then to -- to Lone Star Road.

4   Q.   Did the Defendant tell you whether or not

5   Mr. Daniel Cobb, the owner of the bus, was on

6   board during that run?

7   A.   He was.

8   Q.   And did the Defendant tell you whether or

9   not he said anything or told Mr. Cobb anything

10  about how he was feeling before he started

11  driving the bus?

12  A.   He told Mr. Cobb he was tired.

13  Q.   And according to the Defendant what

14  response, if any, did Mr. Cobb give to him?

15  A.   I'm going to need to refer to my report to

16  get the exact wording.

17  Q.   Page 427.

18  A.   His reply was, "Yeah.  As far as I know

19  just said drive," referring to Mr. Cobb or

20  Mr. -- yeah, Mr. Cobb telling him to drive.

21  Q.   Did the Defendant indicate to you anything

22  suggesting or indicating that Mr. Cobb

23  threatened to fire him or told him his job would

24  be in jeopardy if he said he just couldn't drive

25  because he was too tired?

```
 1    A.    No.

 2    Q.    Nothing like that?

 3    A.    No.

 4    Q.    According to the Defendant; is that

 5    correct?

 6    A.    Correct.  He made no comments like that.

 7    Q.    Let's go out onto Lone Star Road.  Did you

 8    specifically discuss with the Defendant what, if

 9    anything, he remembered about once he was

10    driving the bus on Lone Star Road?

11    A.    Yes.

12    Q.    And specifically were you talking to him

13    about what, if anything, he remembered about

14    what was happening just before the collision

15    occurred?

16    A.    Yes.

17    Q.    And what did the Defendant tell you?

18    A.    That he blacked out and he awoke and was

19    looking out the front of the bus.

20    Q.    And did he describe to you how the front of

21    of the bus looked?

22    A.    He -- I believe, yes, he did.

23    Q.    What did he say?  Page 427.

24    A.    "Just black out, man.  Next thing I

25    remember is freaking, the bus mangled and I'm
```

000319

1   out there asking people what the hell happened."

2   Q.    Did the Defendant indicate to you whether

3   or not he remembered anyone saying anything to

4   him while he was driving just before the

5   collision occurred?

6   A.    He -- nobody said anything to him.

7   Q.    Was he able to remember whether or not

8   anyone came up to him, approached the driver's

9   area prior to the collision occurring?

10  A.    He didn't remember anything like that

11  happening.

12  Q.    Did he remember anybody grabbing the

13  steering wheel or trying to wake him up?

14  A.    No.

15  Q.    Did you speak with the Defendant about

16  whether or not he was wearing his seat belt

17  while he was driving this bus?

18  A.    Yes.

19  Q.    And what, if anything, did he tell you

20  about whether he was wearing his seat belt?

21  A.    He said he wasn't wearing it, that he never

22  wears it.

23  Q.    Now, did you speak with the Defendant about

24  whether or not he had any type of chronic

25  medical condition?

1   A.   Yes.

2   Q.   And did he tell you that he does have a

3   chronic medical condition or disease?

4   A.   Yes, he does.

5   Q.   What did he tell you that was?

6   A.   He said he had diabetes.

7   Q.   Did he indicate to you whether or not he

8   was insulin dependent?

9   A.   Yes.

10   Q.   And he said that he was insulin dependent?

11   A.   Yes.  He needed injections to keep blood

12   sugar under control, insulin injections.

13   Q.   Now, was he asked whether or not he carries

14   an insulin pack with him during the course of

15   the day in case he needs to give himself an

16   injection on an emergency basis?

17   A.   He told us that he kept the insulin at home

18   in the refrigerator, and then he checked it in

19   the morning and in the evening.

20   Q.   So he checks and injects twice a day,

21   morning and evening; is that correct?

22   A.   Correct.

23   Q.   Based on what he told you?

24   A.   On what he told us, yes.

25   Q.   Now, did you discuss with the Defendant how

1   he goes about calculating what dosage of insulin

2   he requires should his test reveal that he needs

3   to inject himself?

4           MR. SMITH:  Objection; irrelevance.

5   There's no foundation for this question for this

6   witness.

7           THE COURT:  Overruled.

8           THE WITNESS:  Yes, we discussed that.

9           BY MR. DATIG:  Q.  And did he tell you

10  in general terms how he calculates his dosage?

11  For example, does he use any kind of written

12  materials or how does he calculate what dose he

13  needs?

14  A.   He told us he used to have a card, but he

15  lost it, so what he does is checks his blood

16  sugar level, and if it's in the 2 or 300 range

17  he would give himself 35, I think it was 35,

18  give himself some insulin, he would wait about

19  an hour, hour and a half, check it again.  If it

20  was still high, he would take some more insulin.

21  Q.   And was he specifically asked if he plays

22  his dosage by ear?

23  A.   Yes.

24  Q.   And what did he say or how did he

25  characterize how he calculates his dosage?

1   A.    I'd have to look at my report.

2   Q.    Page 429.

3   A.    Yeah, "Guessing like, you know."

4   Q.    "Guessing like, you know"; is that correct?

5   A.    Correct.

6   Q.    Now, did you ask the Defendant whether or

7   not he recalled checking his blood sugar level

8   on Saturday night or early morning Sunday,

9   October 5th before he went to bed at around 4:00

10  to 4:30 a.m.?

11  A.    He wasn't sure if he checked it Sunday

12  morning before going to work.

13  Q.    Did the Defendant tell you what, if

14  anything, or what kind of symptoms he gets if

15  his blood sugar level gets too high and he can't

16  inject himself with insulin?

17  A.    He gets drowsy and tired.

18  Q.    Did the Defendant indicate to you whether

19  or not he was under a doctor's care for any

20  other types of medical conditions?

21  A.    Yes.

22  Q.    And what did he tell you about that?

23  A.    He was also taking medication for high

24  blood pressure.

25  Q.    Did he tell you who his regular doctor was?

1    A.    Yes.

2    Q.    Was that Dr. Malick?

3    A.    I think it's Dr. Malick.

4    Q.    Malick.  Now, did the Defendant tell you,

5    or did the Defendant give any opinion to you

6    regarding whether or not his not eating for the

7    period of time until he went to Taco Bell and

8    having fruit punch before he left on the Colusa

9    trip whether or not that may have had any effect

10   on his blood sugar, did he tell you what he

11   thought about that situation?

12   A.    He thought that it didn't have any effect.

13   He was just tired.

14   Q.    Did he tell you anything specifically about

15   why he had juice instead of diet soda that day?

16   A.    He said it was just something to drink.

17   Q.    Did he indicate to you whether or not he

18   felt it was appropriate for him to drink that

19   kind of beverage given his condition?

20   A.    I have to look in my report.

21   Q.    Page 437.

22   A.    Something -- when asked why did he have the

23   juice, his reply was, "Something to drink even

24   though I knew I probably shouldn't have."

25   Q.    Did he indicate to you whether or not when

000324

1    he had that drink he was thinking about what

2    possible effect it might have on his blood sugar

3    getting too high?

4    A.    He said he wasn't even thinking about it.

5    Q.    And again, you asked him whether or not he

6    thought his blood sugar issue might be a factor

7    in his being tired; is that correct?

8    A.    Correct.

9    Q.    And specifically can you tell us exactly

10   what he said in that regard?

11   A.    "No.  I was just tired, I wasn't sure -- I

12   was sure it wasn't a factor then.  I was just

13   plain tired, man.  But no, trying to hold onto a

14   job, man."

15   Q.    Now, I'd ask you to take another look at

16   page 437 and ask you if the Defendant had given

17   any other opinion as to whether or not his

18   eating and drinking that afternoon before

19   leaving for Colusa, whether or not that may have

20   had any effect on his blanking out as he put it?

21   A.    When asked if drinking the sugar raised the

22   blood sugar up to high, he replied, "I don't

23   think so."

24   Q.    Now, did the Defendant indicate to you

25   whether or not in the course of his commercial

000325

1   driving in the past he had ever been fatigued

2   while driving a commercial vehicle before?

3   A.   Yes.

4   Q.   And what did he tell you that he would do

5   in the past if he was fatigued while driving a

6   commercial vehicle?

7   A.   He'd pull over and stop driving.

8   Q.   Did he tell you how many times he had done

9   that in the past in general terms?

10  A.   I don't recall.

11  Q.   Take a look at page 439 of the transcript,

12  see if that refreshes your recollection.

13  A.   His reply when asked about pulling over

14  was, "Many times."

15  Q.   Okay.  So based on what the Defendant told

16  you then, he's diabetic, but he believes his

17  diabetes had nothing to do with this situation.

18  But assuming, and let's assume for a moment that

19  that is true, okay.  But assuming that the

20  Defendant got up on Saturday morning, October

21  4th at 4:00 to 4:30 a.m., he arrived home on

22  Sunday morning, October 5th, based on his own

23  statements to you, between 3:30 and 4:00 a.m.,

24  slept for one to one and a half hours, awoke

25  again at 5:00 a.m., then went to work, went on

1   the Thunder Valley run that morning and slept

2   another hour and a half to two hours on the bus.

3   Are you with me so far?

4   A.    Yes.

5   Q.    And this is what the Defendant told you

6   during the course of your interview with him; is

7   that correct?

8   A.    Correct.

9   Q.    Now, while the Defendant was driving, do we

10  know, based on the investigation, approximately

11  what time the traffic collision in this case

12  actually happened?

13  A.    Yes.

14  Q.    About what time was that?

15  A.    6:10 in the evening.

16  Q.    6:10 p.m.; is that correct?

17  A.    Correct.

18  Q.    So from Saturday, October 4th at 4:30 a.m.

19  to Sunday, October 5th at 6:10 p.m., correct me

20  on my math if I'm wrong, but that's about 37

21  hours; is that correct?

22  A.    Correct, 37 to 37 and a half hours.

23  Q.    And according to the Defendant he had had

24  approximately three to three and a half hours of

25  sleep during that period of time before the bus

000327

1  crashed; is that correct?

2  A.   Correct.

3  Q.   Now I'd like to take you to Tuesday,

4  December 9th, 2008.  On that day, did you do a

5  follow-up interview with the Defendant,

6  Mr. Watts?

7  A.   Yes.

8  Q.   And again, was that interview recorded with

9  his knowledge or was that recording transcribed?

10  A.   Yes, it was.

11  Q.   And you have that transcription here in

12  court in front of you; is that correct?

13  A.   Correct.

14  Q.   And of course, as was the case with the

15  other interview, the recording and the

16  transcript are available to the defense; is that

17  correct?

18  A.   Correct.

19  Q.   Now, Investigator Parsons was with you in

20  the interview that occurred on the 8th; is that

21  correct?

22  A.   Correct.

23  Q.   Was an investigator, Parsons or some other

24  member of your M.A.I.T. team who was present

25  with you on the interview on December 9th?

```
 1    A.    It was another investigator, Investigator

 2    Luce.

 3    Q.    Luce, L-u-c-e?

 4    A.    Correct.

 5    Q.    And Investigator Luce also participated in

 6    that interview, asked some questions as well,

 7    correct?

 8    A.    Yes, he did.

 9    Q.    What was the purpose of this second

10    interview?  Why did you go back and talk to the

11    Defendant again?

12    A.    We had found out the initial information

13    about his -- some of his medical conditions, and

14    we'd also progressed in the investigation of the

15    accident.  We just had follow-up information,

16    wanted to get a little more of a baseline of,

17    you know, where he was born, where Mr. Watts

18    went to school, what his training was prior to

19    becoming a truck driver and then track a little

20    bit more in his training as a truck driver.

21    Q.    Now, was Mr. Watts in custody during this

22    interview?

23    A.    Yes.

24          MR. SMITH:  May counsel approach the

25    bench?
```

00032

1          THE COURT:  Yes.

2             (Bench conference, unreported)

3          THE COURT:  It's about time for our

4     afternoon break.  At this time we're going to

5     release the jurors until 3:05.  You're on the

6     same admonition that I've advised you about at

7     every break so far.  Court's in recess.

8             (Whereupon the jury left the

9             courtroom)

10          THE COURT:  All right.  We're back on

11     the record, all the jurors have left the

12     courtroom.  There was a side bar.  Counsel is

13     taking this opportunity to review the records.

14     There was also a previous side bar in which

15     there was some discussion and an objection had

16     been made regarding the license status of the

17     Defendant.  That has been resolved, I believe.

18     Is that objection withdrawn at this time,

19     Mr. Smith?

20          MR. SMITH:  Yes, Your Honor.

21          THE COURT:  All right.  And I believe,

22     Mr. Poyner, there was something else earlier

23     this morning that we indicated we would be on

24     the record before the end of the day?

25          MR. POYNER:  Yes.  To the discussion

1    about the Fox 40 interview.

2         THE COURT:  Yes.  Do you want to do

3    that in open court or do that in chambers?

4         MR. POYNER:  I think we should do that

5    in chambers after we're done for the day.

6    -       THE COURT:  All right.  Save it to the

7    end of the day then.

8         MR. POYNER:  If that's okay.

9         THE COURT:  That's fine.  All right.

10   Court's in recess.

11        (Recess)

12        THE COURT:  Back on the record in

13   People versus Watts.  Counsel for both sides are

14   present, the Defendant's present, the witness is

15   on the stand.  The jurors, they are all back.

16        Prior to the break there was a dispute

17   regarding the contents of the transcript.  Has

18   that been resolved over the break?

19        MR. SMITH:  Context -- I misunderstood

20   you at first, Your Honor.  Is Your Honor talking

21   about the -- the statement that the officer took

22   from the Defendant while he was in custody?

23        THE COURT:  Whether there was Miranda

24   or not.

25        MR. SMITH:  There's no objection to

000331

1    that being inquired into.

2              THE COURT:  All right.  Then nothing

3    further, then I'll have the jury brought in.

4              (Whereupon the jury entered the

5              courtroom)

6              THE COURT:  All right.  All the jurors

7    are present, the alternates are both present.

8    When we took a break, Mr. Datig was questioning

9    the witness.  He may resume.

10             MR. DATIG:  Thank you, Your Honor.

11             MR. SMITH:  Your Honor, the witness is

12   referencing some written materials.  Could I ask

13   for those to be identified if he refers to them

14   during his testimony?

15             THE COURT:  If you're going to use

16   those during testimony, be sure to tell us that.

17             THE WITNESS:  Okay.

18             BY MR. DATIG:  Q.  Now, Investigator

19   Hamann, I want to take you back, before we go

20   into the interview in December I want to take

21   you back for just a moment to the October 8th

22   interview that we had been speaking of

23   previously.  And specifically I would like to

24   take you back to page 437 of the transcript.

25   A.    Okay.

1    Q.    Now, I'd asked you previously whether or

2    not prior to, immediately prior to Mr. Watts

3    indicating that in his opinion blood sugar or

4    diabetes had nothing to do with the crash, but

5    rather it was because he was so tired, I had

6    asked you whether or not he had expressed

7    another opinion as to what may have also

8    contributed to his fatigue and/or the crash.  Do

9    you recall those questions?

10   A.    Yes.

11   Q.    Having now had the opportunity to refresh

12   your recollection by reviewing the transcript,

13   did Mr. Watts in fact give you a different

14   opinion as to what may have contributed to his

15   doziness or blanking out?

16   A.    Yes, he did.

17   Q.    And what did he tell you?

18   A.    I asked him if having not eaten very much

19   at all on Sunday and then going to Taco Bell, do

20   you think that raised it up high, his blood

21   sugar.  And he replied, "I think that did raise

22   it up to high, yeah, I do think so."

23   Q.    And then immediately after that, actually

24   on that same page of the transcript he said,

25   "No, I was just tired"; is that correct?

000333

1    A.    Correct.

2    Q.    Now, I'd like to take you forward again to

3    the follow-up interview that you told us that

4    you and Investigator Luce had conducted with the

5    Defendant on December 9th, about two months

6    later for purposes of developing more background

7    and clarifying certain points.  And you

8    testified that at that point the Defendant was

9    in custody; is that correct?

10   A.    Correct.

11   Q.    And I had inquired of you as to whether or

12   not the Defendant was again informed of his

13   Miranda rights prior to the interview beginning;

14   is that correct?

15   A.    Correct.

16   Q.    And was he informed of his rights?

17   A.    Yes, he was.

18   Q.    Specifically did you tell him that

19   he had -- or was he told that he had a right to

20   remain silent and anything he said could and

21   would be used against him in a court of law?

22   A.    Yes.

23   Q.    And was he told that he had the right to

24   have an attorney present before or during

25   questioning, and if he couldn't afford one, one

00033

1    would be appointed for him at no cost?

2    A.    Correct, yes.

3    Q.    Did he indicate he understood those rights?

4    A.    Yes.

5    Q.    And did he choose to speak with you?

6    A.    Yes.

7    Q.    Now, during the course of this interview,

8    did you confirm with the Defendant that he is an

9    insulin diabetic?

10   A.    Yes.

11   Q.    And did he tell you approximately how long

12   before the interview he had actually been

13   diagnosed with that condition?

14   A.    Yeah.  He said for about six years.

15   Q.    And did he in fact consent to

16   investigators, either yourself or Investigator

17   Luce actually confirming that with his doctor if

18   necessary?

19   A.    Yes.

20   Q.    Now, during the course of this interview, I

21   take it you spoke with the Defendant on a number

22   of topics that aren't necessarily relevant here,

23   but during the course of this interview, did you

24   again speak with the Defendant specifically

25   about his activities on Saturday, October 1st

000335

1    and Sunday, October 5th?

2    A.    Saturday the 4th.

3    Q.    The 4th, and Sunday the 5th -- did I say

4    the 1st?

5              MR. SMITH:    Yes.

6              BY MR. DATIG:    Q.    I'm sorry,

7    Saturday the 4th and Sunday the 5th.

8    A.    Yes, we covered that time period again.

9    Q.    And referring you specifically to page 475

10    of the transcript, did you specifically ask him,

11    "We had talked previously about Saturday before

12    the accident, Sunday the accident, is there

13    anything now that some time has gone by that you

14    can recall?"

15    A.    Yes, I asked that.

16    Q.    And did the Defendant give you a -- a

17    response to that question?

18    A.    Yes.

19    Q.    And was the response somewhat lengthy, at

20    least in terms of the transcript?

21    A.    Yes.

22    Q.    I take it you wouldn't be able to remember

23    it word for word from memory?

24    A.    No.

25    Q.    Okay.    For purposes -- purposes of accuracy

000336

1    then could you tell us what the Defendant said

2    in response to that question?

3    A.    Yes.   "Yeah, there is.   The trip I made

4    before the accident, okay.   We did the same trip

5    the day before the accident, and we left the

6    casino, I guess like, I don't know, maybe 9:00,

7    10:00 o'clock, something like that, got back to

8    Sacramento like 12:00, something like that, and

9    then we had to drop everybody off.   By the time

10   we'd done that it was like 1:00 or 2:00 in the

11   morning.   Then we went to park the bus, and I

12   had to drive back to Stockton, which was like

13   another hour.   It was like 3:00, 3:30 by the

14   time I got home.   I went to sleep and I got up

15   at 6:00.   So I may have only gotten like two

16   hours sleep that night.   And I went back to

17   work, and I tell my stepfather, you know, I told

18   him I was tired.   And I was hecka tired, but he

19   said that's okay.   He wanted me to drive anyway

20   and I did.   And I guess that was -- and that was

21   the end."

22   Q.    Now, did you then ask him what time did you

23   guys start that morning?

24   A.    Yes.

25   Q.    And did he respond to that question?

000337

1    A.    Yes.

2    Q.    And what did he tell you?

3    A.    7:00 or 7:30 that morning.

4    Q.    And at 7:00 or 7:30 that morning did the

5    Defendant indicate to you that that was for

6    purposes of going on that Thunder Valley Casino

7    run that morning?

8    A.    Yes.

9    Q.    And then did you ask him, or was he asked

10   either by you or Investigator Luce about the

11   Colusa Casino run that same day, that being

12   Sunday the 5th?

13   A.    Yes.

14   Q.    And did he respond to that question?

15   A.    Yes, he did.

16   Q.    And again, was the response somewhat

17   lengthy?

18   A.    It was.

19   Q.    For purposes of accuracy then, could you

20   tell us what the Defendant said in response to

21   that question?

22   A.    "And then Colusa in that -- 4:30 it was

23   Colusa.  And I was hecka tired then.  I even

24   told my stepsisters, they knew I was hecka

25   tired, but they wanted me to drive.  And I

000338

1    didn't say -- I didn't complain too much about

2    it because I was like, I'm just -- I just, you

3    know, want a job.  I wanted to, you know, get

4    trained on this route because once I'm trained

5    on this route I start making $700 a week.  So

6    I'm not really doing a whole lot of complaining

7    about it.  I'm like, okay, you know, I need this

8    money" -- correction, "I'm like, okay, you know,

9    I need this job, this money, you know," and then

10   he trailed off.

11             MR. DATIG:  Thank you, Investigator.

12   No further questions, Your Honor.

13             THE COURT:  Cross-examination,

14   Mr. Smith.

15                 CROSS-EXAMINATION

16             BY MR. SMITH:  Q.  I'm really bad with

17   this before midnight, after midnight thing, so

18   when you talked about last night.  So I'm trying

19   to narrow this down, okay?

20   A.    Okay.

21   Q.    Let's talk about Friday evening to begin

22   with.

23   A.    Okay.

24   Q.    My client went to bed approximately 9:00

25   p.m.; is that correct?

000339

1    A.    Correct.

2    Q.    And he got up approximately 4:30 a.m.

3    A.    Correct.

4    Q.    Saturday morning he got up around 4:30

5    a.m.?

6    A.    Correct.

7    Q.    Seven and one half hours approximately?

8    A.    Correct.

9    Q.    Okay.  He slept -- well, he didn't sleep

10   well, he tossed and turned.  He slept like a

11   log, but that's how long he was in bed?

12   A.    I'm sorry, can you repeat that?

13   Q.    I'm not saying how well he slept.  I'm

14   saying that's all -- how long he was in bed?

15   A.    Correct.

16   Q.    The next morning, Saturday morning he goes

17   to work, but he doesn't go to work driving,

18   right, he goes to work to clean a bus?

19   A.    In the beginning he cleans the bus and

20   helps do the pretrip inspections.

21   Q.    Right.  And then he got on the bus and was

22   a passenger?

23   A.    Correct.

24   Q.    Okay.  So he was in the back of that bus,

25   and this is on Saturday, and he's getting some

000340

1    rest in the back of the bus?

2    A.   I believe that was Sunday morning that he

3    was resting in the back of the bus.

4    Q.   It was, but we're still at Saturday.

5    A.   Okay.  Saturday he was assisting his -- the

6    driver of the bus with the passengers.  He

7    didn't mention anything about trying to sleep on

8    the bus on Saturday.

9    Q.   Okay.  He didn't state that he slept

10   approximately one to two and a half hours

11   between 3:30 and 6:00 p.m.?  I'm talking about

12   page 81 of the M.A.I.T. report.  October 4th

13   would be Saturday, correct?

14   A.   Correct.

15   Q.   All right.

16   A.   I'm trying to get to that part of the

17   report.

18   Q.   On page 81, and I'm about four paragraphs

19   down.

20   A.   Okay.  The -- a couple sentences before

21   that it changes the day to Sunday, October 5th.

22   Q.   Okay.  So that 3:30 is 3:30 in the morning?

23   A.   Yes.

24   Q.   All right.  So that's approximately two,

25   two and a half hours of sleep?

000341

1    A.    Correct.

2    Q.    Okay.  Next paragraph down is October 5th

3    as well, correct?

4    A.    Correct.

5    Q.    "Watts was in the back of the bus while

6    Witness Cobb made stops and picked up

7    passengers."  Now, I'm using the term "Witness

8    Cobb" refers to not the Mr. Cobb that died in

9    this collision, but somebody who is a member of

10   the business with the same name, correct?

11   A.    Correct.

12   Q.    My client's sister?

13   A.    Correct.

14   Q.    All right.  And she was training other

15   drivers at that time; is that correct?

16   A.    She was training Mr. Watts.

17   Q.    Okay.  And Mr. Watts was resting on that

18   bus and not driving the bus at that point in

19   time on the morning of October 5th?

20   A.    Correct.

21   Q.    How long did he sleep, if he slept during

22   this period of time?

23   A.    He estimated that he slept about one and a

24   half to two hours -- wait, I'm sorry.  That was

25   mostly back at the casino.  He didn't give an

000342

1   amount of time while they were traveling.

2   Q.   So starting around 7:00 a.m. we don't know

3   how much sleep or even if he got any sleep?

4   A.   He did not tell us that he got any sleep,

5   no.

6   Q.   We just know he was resting starting around

7   that time?

8   A.   Correct.

9   Q.   He arrived at Thunder -- Thunder Valley

10  Casino, this is Saturday, I assume?

11  A.   I'm sorry?

12  Q.   He arrived at Thunder Valley Casino at

13  approximately 9:00 a.m.?

14  A.   Correct, yes.

15  Q.   We're still on Saturday?

16  A.   No.   This would be on October 5th, so this

17  would be Sunday.

18  Q.   This is Sunday, the day of the wreck?

19  A.   Correct.

20  Q.   Okay.   He remained on the bus in order to

21  get some rest while the passengers gambled at

22  the casinos, did he tell you how much rest he

23  got?

24  A.   One and a half to two hours.

25  Q.   Okay.   Later at the end of that paragraph,

000343

1   "Watts slept in the seat at the rear of the bus

2   because he was tired.  Watts said he slept for

3   maybe an hour to two hours until shortly before

4   1:30 p.m."  Is that a different time?

5   A.   Actually it's 1300, that would be 1:00 p.m.

6   Q.   Okay.  He said a different time than the

7   resting he did at 9:00 a.m.?

8   A.   No.  That's from 9:00 a.m. to 1:00 o'clock,

9   in that time span of four hours he was able to

10   sleep about an hour and a half is what he

11   estimated.

12   Q.   So he remained on the bus starting at 9:00

13   a.m. and only got an hour and a half sleep by

14   1:00 p.m., four hours?

15   A.   He was on the bus that long.  He estimated

16   that he was only able to sleep for an hour and a

17   half to two hours.

18   Q.   Are there any televisions, VCRs or that

19   sort of entertainment on these buses?

20   A.   I don't know about this bus.  I didn't

21   inspect this bus or the M.A.I.T. team didn't

22   inspect Elaina Cobb's bus, so I wouldn't know.

23   Q.   This bus has oversized seats and a sleeping

24   compartment in the luggage area, that's the only

25   amenities it has; isn't that true?

000344

1    A.    I don't think they inspected this bus.

2    This is not the bus that was involved in the

3    crash.   Elaina drove a different bus.

4    Q.    When did -- what did Mr. Watts do after

5    1:00 p.m. on October 5th?

6    A.    They all -- the bus traveled back to the

7    Sacramento area, which was -- probably started

8    dropping off passengers.

9    Q.    Who was driving for that trip?

10   A.    Elaina Cobb.

11   Q.    Okay.   What was Mr. Watts doing during that

12   time?

13   A.    I'd have to refer to my report.   I don't

14   know if we cover that time frame with him.   He

15   was trying to sleep then or was -- whether he

16   was awake or not.

17   Q.    Okay.   He's on the bus, and he's not

18   driving then; is that correct?

19   A.    Correct.

20   Q.    All right.   When did the bus that left that

21   ultimately wrecked, when did that leave

22   Sacramento?

23           MR. DATIG:   Perhaps if we could have a

24   transcript reference page?

25           THE COURT:   Can you tell us the

000345

227    Britt & Associates   (530) 671-5001

1    transcript page you're on?

2            THE WITNESS:  I'm still on page 475.

3    It was 4:00 or 4:30.  There was a lot of 4:00,

4    4:30.  I'm not sure exactly if it was Sunday

5    that he left at 4:30 or if he said it was

6    Saturday.

7            BY MR. SMITH:  Q.  Well, the statement

8    that I have on the top of page 475 starts off

9    with, "And then Colusa in that 4:30," appreciate

10   the poor grammar, but that's what I'm reading.

11   A.    Okay.

12   Q.    Okay.

13   A.    Okay.  So, yeah, according to the second

14   interview it was 4:30.

15   Q.    And we could assume that these are

16   estimates?

17   A.    Yes.

18   Q.    Okay.  What did we know about Mr. Watts

19   resting or sleeping between 1:00 p.m. and 4:30

20   p.m.?

21   A.    During that time he had -- once he got back

22   to the yard after dropping off the passengers,

23   he said that he had -- that's when he had gone

24   to Taco Bell and that he had tried to lay back,

25   but he didn't think he was able to sleep at all.

000346

1    Q.    Mr. Watts's blood sugar levels were tested

2    at the scene of this crash, were they not?

3    A.    They were tested by the ambulance

4    personnel.  I don't know if it was at the scene

5    or if it was while he was being transported to

6    the hospital.

7    Q.    You were made aware what the results of

8    those tests were, were you not?

9    A.    Yes.

10   Q.    Okay.  His blood sugar level was measured

11   at --

12             MR. DATIG:  Objection; no foundation.

13             MR. SMITH:  It's part of his report.

14   His report is the basis of his opinion.

15             THE COURT:  Overruled.

16             BY MR. SMITH:  Q.  He had normal blood

17   sugar, didn't he?

18             MR. DATIG:  Objection; no foundation

19   this witness has the expertise to testify to

20   that, Your Honor.

21             MR. SMITH:  Then allow me to proceed.

22   Q.    Mr. Watts testified to you, answered your

23   questions stating that his targeted blood sugar

24   levels are between 70 and 170?

25             THE COURT:  For the record, the

000347

229    Britt & Associates   (530) 671-5001

1   objection is sustained.

2            BY MR. SMITH:   Q.   Mr. Watts told you

3   his targeted blood sugar levels are between 70

4   and 170?

5   A.   Correct.

6   Q.   Okay.   He told you that if his blood sugar

7   levels are 2 to 300, he takes 35 units of

8   insulin to reduce his blood sugar levels?

9   A.   Correct.

10  Q.   His blood sugar levels were measured at the

11  scene of this accident?

12            MR. DATIG:   Objection; misstates the

13  testimony.

14            MR. SMITH:   If he knows.

15            THE COURT:   Overruled.

16            THE WITNESS:   It was -- I'm not sure

17  if it was at the scene or if it was while he was

18  being transported to the hospital.   Woodland is

19  quite a ways from the collision scene, maybe it

20  was by the ambulance personnel that his blood

21  sugar was tested, yes.

22            BY MR. SMITH:   Q.   Well, what were the

23  results?

24  A.   I'm going to have to refer to my report.

25  Q.   Please do.

000348

1          THE COURT:  Please tell us what page

2    you're on.

3          THE WITNESS:  I'm looking at page 89

4    of the collision report.

5          MR. SMITH:  That's fine, but I'm going

6    to point you towards page 905, Volume III.

7          MR. DATIG:  Your Honor, I'm going to

8    interpose an objection.  May we approach?

9          THE COURT:  All right.

10          (Bench conference, unreported)

11          MR. SMITH:  Your Honor, I believe we

12    have an evidentiary stipulation that will cover

13    this issue.

14          THE COURT:  Thank you, counsel.  If

15    you'd state the stipulation.

16          MR. SMITH:  Your Honor, it's already

17    been demonstrated that military time is not my

18    forte, but between 7:48 p.m., 1948 and 7 --

19          MR. DATIG:  8:28.

20          MR. SMITH:  8:28, I beg your pardon.

21    Between those hours my client's blood sugar

22    levels were measured at 171.

23          THE COURT:  Is that the stipulation,

24    counsel?

25          MR. DATIG:  That's the first part,

1    Your Honor.

2            MR. SMITH:  It was measured later, and

3    by later I mean at 2030 hours, 8:30 and was

4    measured at 243.

5            THE COURT:  And that is the complete

6    stipulation?

7            MR. DATIG:  So stipulated, Your Honor.

8            THE COURT:  Mr. Smith, so stipulated?

9            MR. SMITH:  Yes, Your Honor.

10           THE COURT:  Ladies and gentlemen,

11   that is an exception to the otherwise practice

12   in court.  When there is a stipulation, you are

13   to assume those facts as conclusively proven.

14   So now that bit of information conclusively

15   proves that between those hours the blood sugar

16   levels are as stipulated, according to the

17   measurements taken.

18           BY MR. SMITH:  Q.  Mr. Watts told you

19   that he --

20           THE COURT:  One more thing, counsel.

21           MR. SMITH:  Excuse me.

22           THE COURT:  There was an objection

23   made, no ruling was made on it.  That objection

24   is sustained at this time.  It's been superceded

25   by the stipulation.

000350

1           Proceed, counsel, I'm sorry.

2           MR. SMITH:   Thank you, Your Honor.

3    Q.   So we have our stipulation that the first

4    measured blood sugar level was 171, Mr. Watts

5    told you he tries to maintain his blood sugar

6    level between 70 and 170?

7    A.   Correct.

8    Q.   He told you he takes medication when it's

9    in the 200 or 300s?

10   A.   Correct.

11   Q.   And he told you he believes that he was

12   tired and that he told his employer he was tired

13   before he started driving on this trip?

14   A.   Yes.

15   Q.   Now, everybody uses slang, "hecka tired" is

16   a way of saying very tired without swearing;

17   would you agree with me on that one?

18   A.   I would, yes.

19   Q.   Okay.  So we might reasonably say very

20   tired, meaning that's what "hecka tired" means?

21   A.   Yes.

22   Q.   Mr. Watts was being trained by more than

23   one person at this business?

24   A.   Correct.

25   Q.   They're both named Cobb just to confuse us

1   a little bit further?

2   A.   Correct.

3   Q.   And there were other drivers being trained

4   for portions of this time?

5   A.   I'm not aware of that.

6   Q.   Okay.  And my client was being trained both

7   behind the wheel and other than being behind the

8   wheel for various trips that we've testified

9   about?

10   A.   Yes.

11   Q.   On the realm of being an unfair question,

12   would you assess Mr. Cobb as being cooperative

13   during your questioning?

14   A.   Mr. Cobb?

15   Q.   Did I say Mr. Cobb?  I knew I'd do that.

16   Mr. Watts.

17   A.   No.  He was, yeah, very courteous.

18             MR. SMITH:  Okay.  Nothing further,

19   Your Honor.

20             THE COURT:  Any redirect?

21             MR. DATIG:  No redirect, Your Honor --

22   well, there is one question.  I apologize to the

23   Court.  I seem to always have just one more.

24                REDIRECT EXAMINATION

25             BY MR. DATIG:  Q.  Investigator

000352

1   Hamann, based upon what Mr. Watts told you about

2   what his normal range for blood sugar is and our

3   stipulation, both those numbers, 171 and 243,

4   they're both above 170, aren't they?

5   A.   Yes.

6            MR. DATIG:  No further questions.

7   Thank you, Your Honor.

8            THE COURT:  Any cross?

9            MR. SMITH:  Nothing further, Your

10  Honor.

11           THE COURT:  Is this witness excused?

12           MR. DATIG:  Yes, Your Honor.

13           MR. SMITH:  Yes, Your Honor.

14           THE COURT:  Thank you.

15           MR. POYNER:  No, Your Honor, he's not.

16           MR. DATIG:  I'm sorry, Your Honor.

17           MR. POYNER:  I'm going to have to

18  bring him back tomorrow.

19           THE COURT:  All right.  You're subject

20  to recall.

21           Call your next witness, counsel.

22           MR. DATIG:  Thank you, Your Honor.

23  The People's next witness would be Investigator

24  Dan Drake.

25           THE COURT:  Please come forward, raise

000353

another part of The Transcript That has Mr. Tiamanns testimony. Which also
Shows all The lies he told on page 58 he said he Talked To my step Father
who died in The accident, Mr. Cobb False evidence

Case 2:17-cv-00379-MCE-KJN   Document 1   Filed 02/21/17   Page 66 of 87

1            THE WITNESS:  Thank you, Your Honor.

2            THE COURT:  Your next witness, Mr. Poyner?

3            MR. POYNER:  Call Officer Hamann.

4                       SIMON HAMANN,

5    a witness called by the Plaintiff, after being first duly

6    sworn to state the truth, the whole truth and nothing but

7    the truth, testified on his oath as follows:

8            THE COURT:  Have a seat.  Once you are settled

9    in, please state your name for the record, spelling your

10   last name.

11           THE WITNESS:  Officer Simon Hamann, H-a-m-a-n-n.

12           THE COURT:  Your witness.

13                    DIRECT EXAMINATION

14           BY MR. POYNER:  Q.  Officer, you are employed by

15   the California Highway Patrol, correct?

16   A.      Yes.

17   Q.      And how long have you been employed by the

18   California Highway Patrol?

19   A.      Over 12 years.

20   Q.      And do you have a specific assignment?

21   A.      Yes.

22   Q.      What is that?

23   A.      I'm an investigator with the Northern Division

24   MAIT unit.

25   Q.      And you were one of the investigators with

1  regard to the bus crash we've talked about, correct

2  A.      Yes.

3  Q.      And one of your assignments specifically was

4  that you talked with the Defendant, correct?

5  A.      Correct.

6  Q.      And where was it that you talked to him?

7  A.      The first time I talked with him was at Woodland

8  Memorial Hospital.

9  Q.      How many times, total, did you talk to him?

10  A.      Four, actually.  Once at Woodland Memorial

11  Hospital, once at Duell Vocational, once by telephone, and

12  then after the report was completed, I also spoke with

13  Mr. Watts one time by phone.

14  Q.      Okay.  Now, was Mr. Watts Mirandized before you

15  talked to him?

16          MR. SMITH:  Which statement?

17          MR. POYNER:  The first statement.  Thank you.

18          THE WITNESS:  Yes.

19          BY MR. POYNER:  Q.  Do you remember if he was

20  Mirandized at the second statement?

21  A.      Yes.

22  Q.      How about the third?

23  A.      No.

24  Q.      And the third was over the phone?

25  A.      Yes.

1  Q.        And he was in custody or not in custody?

2  A.        In custody.

3  Q.        And the fourth one?

4  A.        I believe on the fourth one, he was no longer in

5  custody and he was not Mirandized.

6  Q.        Okay.  Now --

7            THE COURT:  I'm sorry.  Was the fourth in person

8  or by phone, also?

9            THE WITNESS:  By phone.

10           (Pause.)

11           MR. POYNER:  Well, can I have a moment with

12 Mr. Smith?

13           THE COURT:  Yes.

14           (Off-the-record discussion between defense

15           counsel and the Prosecutor.)

16           BY MR. POYNER:  Q.  Now, Officer, I think what

17 I'm going to try to do is confine myself to the first

18 interview.

19           I think that was the most extensive; fair to

20 say?

21 A.        First and second, yes.

22 Q.        Okay.  Well, all right.  In talking to

23 Mr. Watts, did he tell you how long he had been working

24 for Mr. Cobb?

25 A.        Yes.

1  Q.        How long?

2  A.        About a month.

3  Q.        And did he tell you how many days a week he

4  worked?

5  A.        Said he was working seven days a week.

6  Q.        Did you ask the Defendant whether or not he felt

7  the bus that he was driving that crashed was mechanically

8  okay?

9  A.        Yes.

10 Q.        And what did he say?

11 A.        He said he didn't know of any mechanical

12 problems with the bus.

13 Q.        All right.  And in talking with Mr. Cobb (sic),

14 were you able to calculate from his answer how many hours

15 of sleep he had in the past 35 hours prior to this

16 accident?

17 A.        Yes.

18 Q.        What was that?

19 A.        Two and a half to four and a half hours of

20 sleep.

21          THE DEFENDANT:  That's a lie.  Sitting up there,

22 lying.

23          THE COURT:  Mr. Watts --

24          THE DEFENDANT:  Come on, man.  He's lying.

25          THE COURT:  Mr. Watts, Mr. Watts, please

*obtaining false evidence from a witness*

1   recognize that you are being spoken to.

2           THE DEFENDANT:  Come on, man.

3           THE COURT:  You would be best off, sir, not

4   saying anything.  And if you cannot keep quiet during this

5   proceeding -- and that, frankly, goes for anyone in the

6   audience or anyone else in the courtroom who speaks out of

7   turn, I would have to take appropriate procedure to see

8   that you do not interrupt the proceedings.

9           Do you understand me, sir?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Thank you.

12          MR. SMITH:  Your Honor, could we re-ask the last

13  question?

14          THE COURT:  Do you want the question asked or

15  the answer read back?  Since I assume you probably didn't

16  hear most of the answer --

17          MR. SMITH:  I didn't hear most of the answer and

18  I would like to put the answer in context.

19          THE COURT:  Please read the question and answer

20  back, Mr. Reporter.

21          (Whereupon, the reporter reads back as

22          directed.)

23          BY MR. POYNER:  Q.  Now, Officer, did Mr. Watts

24  give you the general route of travel that he took in

25  heading towards -- well, where the accident took place?

1  A.        General route, yes.  He was not able to recall

2  specific areas where they picked up personnel; but he knew

3  that from Sacramento, they took I-5 north to where the

4  collision occurred.

5  Q.        Okay.  That is what I was after; I-5 north.

6            And then did he indicate to you what road he

7  turned off on?

8  A.        Yes.

9  Q.        Okay.

10  A.        Hahn Road.

11  Q.        Okay.  Now, did you ask him if there had been

12  any problems while he was on I-5 before he turned off onto

13  Hahn Road?

14  A.        Yes.

15  Q.        And his answer?

16  A.        No problems.

17            (Pause.)

18            BY MR. POYNER:  Q.  Now, did you ask him if he

19  ever told Mr. Cobb that he was tired?

20  A.        Yes.

21  Q.        And what was his answer?

22  A.        He had told Mr. Cobb a couple of times that he

23  was tired.

24  Q.        And when you say, "a couple of times," did he

25  indicate to you whether he told him he was tired before he

1  ever started the trip?

2  A.        Yes.

3  Q.        And what was his answer?  What was his answer

4  that he said?

5  A.        That he --

6  Q.        Prior to starting the bus trip -- I'll re-ask

7  it.

8            Prior to starting the bus trip heading up to

9  where the accident took place, prior to taking off, did he

10 indicate to you that he had told Mr. Cobb that he was

11 tired?

12 A.        Yes.

13 Q.        And he did indicate that?

14 A.        Yes, he indicated that.

15 Q.        Okay.  Did he indicate to you at all during the

16 trip that he told Mr. Cobb that he was tired?

17 A.        I don't think he told Mr. Cobb while he was

18 driving that he was tired.

19            (Pause.)

20            BY MR. POYNER:  Q.  Now, in talking to

21 Mr. Watts, did you learn whether he had any medical

22 conditions?

23 A.        Yes.

24 Q.        And what would that be?

25 A.        He said he was diabetic and also had high blood

1  pressure.

2  Q.        And did he indicate to you what he did, if

3  anything, for his diabetes?

4  A.        He injected insulin to keep that under control.

5  Q.        Okay.  And did he have a regular regimen, did he

6  indicate to you, on his insulin injections?

7  A.        Yes.

8  Q.        What did he say about that?

9  A.        He would test himself and, if his blood sugar

10  was too high, he injected insulin, would wait an hour,

11  hour and a half, so then test it again to see if it had

12  come down to what he felt was a comfortable level.

13  Q.        And did he indicate to you how he knew how much

14  insulin to give himself?

15  A.        He used to have a chart he said that he had lost

16  when he had went to prison, so he kind of just -- I can't

17  remember the exact terminology used; but if it was high,

18  then he would give himself some insulin, wait an hour and

19  a half or so, check it again to see if it was still high,

20  and then either give himself more or feel that it was

21  okay.  He didn't have a specific number or a chart that he

22  could look at to find out how much insulin to take.

23  Q.        Kind of hit and miss?

24  A.        Yes.

25  Q.        Okay.  Now, did you ask him if he checked his

1  blood sugar on Sunday morning?  That would be October 5th

2  of last year.

3  A.        Yes.

4  Q.        What did he say?

5  A.        I would have to refer to my report.  I don't

6  recall offhand.

7           MR. SMITH:  Stipulate that the officer may refer

8  to his report, Your Honor.

9           THE COURT:  You may.

10          (Pause.)

11          MR. SMITH:  Perhaps he could tell us which

12 volume and which page number.

13          THE WITNESS:  If you go to page 429 --

14          MR. SMITH:  Volume?

15          MR. POYNER:  Two, I believe it was.

16          (Pause.)

17          THE WITNESS:  Yes, page 429, I think Volume II.

18          Yes, I asked him and he was not sure if he

19 checked his blood sugar that morning.

20          BY MR. POYNER:  Q.  Okay.  Did you ask him what

21 he had eaten that morning?  Talking October 5th.

22 A.        Yes.

23 Q.        What did he say?

24 A.        He did not eat that morning.

25 Q.        Okay.  Did you ask him if he had eaten at all

1   that day?

2   A.          Yes.

3   Q.          And what did he say?

4   A.          He went to Taco Bell in the afternoon.

5   Q.          Do you remember what he said he had to eat?

6   A.          Two tacos and an encharito.

7   Q.          Did he have anything to drink, did he say?

8   A.          He had some juice, sugared juice.

9   Q.          Did you have a conversation with him about

10  having juice with regard to being diabetic?

11  A.          Yes.

12  Q.          What did he say?

13  A.          He said he normally drank diet Pepsi.  On this

14  day, he decided he wanted to drink juice.

15  Q.          And did he indicate that was not good for him?

16  A.          Yes.  Could send his blood sugar high.

17  Q.          Did you ask him what happens when his blood

18  sugar gets high?

19  A.          Yes.

20  Q.          What did he say?

21  A.          That he would get sleepy.

22  Q.          Now, did you ask Mr. Watts how much, if

23  anything, he was being paid to drive the bus?

24  A.          Yes.

25              MR. SMITH:  Objection; relevance.

1               THE COURT:  Relevance as to what he's being

2  paid?

3               MR. POYNER:  Well, Your Honor, the relevance is

4  that he is being paid one amount, and if he successfully

5  completes the trip, the amount more than doubles.

6               MR. SMITH:  I don't mind it being asked, Your

7  Honor, for the limited relevance.

8               THE COURT:  Go ahead.

9               MR. POYNER:  I will start over for you.

10  Q.          Did you ask him if he was being paid anything

11  for driving the truck (sic)?

12  A.          Yes.

13  Q.          What was he being paid?

14  A.          $35.

15  Q.          And was that to increase if he completed his

16  training?

17  A.          Yes.

18  Q.          What was it increased to?

19  A.          Seventy to eighty dollars.

20  Q.          And did he indicate this was his last trip, that

21  he would get his increase?

22  A.          I don't think he ever said that.

23  Q.          Do you want to check page 438 for me?

24               (Pause.)

25               MR. POYNER:  I could be wrong.

1          (Pause.)

2          THE WITNESS:  He said that as soon as he :

3 the routes, he would make more money, but that there was

4 not a specific time line that he had to learn the routes

5 by.

6          BY MR. POYNER:  Q.  Okay.  Thank you.

7          Did you ask Mr. Watts what he thought he could

8 have done to avoid this accident?

9 A.        Yes.

10 Q.        And what did he say?

11 A.        To not go on the trip, on the October 5th trip,

12 stay home.

13 Q.        Did he say something else, also?

14          Please refer to page 441.

15          (Pause.)

16          THE WITNESS:  Just that he should have stayed

17 home.

18          MR. POYNER:  May I approach the witness, Your

19 Honor?

20          MR. SMITH:  Your Honor, I am familiar with the

21 passage that Mr. Poyner's referring to and I don't object

22 to him reading it to the witness, if that would speed

23 things up.

24          MR. POYNER:  Fine.

25 Q.        Do you remember him saying:  Probably not have

1   went, just stayed home, but I need the money, g

2   babies at home I got to feed, I need the money?

3   A.      Yes.

4           (Pause.)

5           BY MR. POYNER:   Q.   Did you ask Mr. Watts

6   whether or not he felt the accident happened because he

7   fell asleep?

8   A.      Yes.

9   Q.      What did he say?

10  A.      He said he blacked out.  And when he talked

11  about him being tired, falling asleep, he said that was

12  probably the cause of the accident.

13  Q.      Did Mr. Watts ever indicate to you that he has

14  had seizures, or at least one seizure?

15  A.      Yes.

16  Q.      What did he say about that?

17  A.      That it only happened one time and he went to

18  see a doctor for it; and then, when he went back to see

19  the doctor again, he was able to explain it and he didn't

20  think it was a big deal because he got his medical

21  certificate for his driver's license.

22  Q.      Now, did he indicate to you when he talked about

23  the seizure, that occurred because of high blood pressure?

24  A.      No.  His statement was because he was taking

25  alcohol and drugs.



BRITT & ASSOCIATES
822 Richland Road, Suite A
Yuba City, CA  95991
PH (530) 671-5001 - FAX (530) 671-1549

000067

1          MR. POYNER:  Nothing further of this witness.

2                     CROSS-EXAMINATION

3          BY MR. SMITH:  Q.  Taking drugs and alcohol

4  sometime other than when we're talking about, correct?

5  A.      Yes.

6  Q.      When was this seizure?  And I don't need the

7  exact date.

8  A.      Sometime before the bus collision.

9  Q.      Well, years, months?

10  A.      I think he had seen the doctor around March of

11  2008.

12  Q.      Okay.  And --

13  A.      Might have been -- might have been in the first

14  months of 2008 that he had seen the doctor.

15  Q.      Now, did Mr. Watts tell you that he probably

16  fell asleep?

17  A.      I think words to that effect, yes.

18  Q.      Well, I think your testimony was that he said

19  probably, right?

20  A.      I would have to look at my report to make sure

21  what he said.

22  Q.      Did he tell you for sure what happened or what

23  he is trying to figure out happened while he spoke with

24  you?

25  A.      No, he did not remember the collision and said

1 that he just blanked out.

2 Q.        And that referred to memory loss, to you?  You

3 take that to mean memory loss?

4 A.        Yes.  He couldn't remember.

5 Q.        Officer, I'm not trying to mince words, really

6 I'm not; but, you see, I want to know if he blanked out

7 and that caused the accident or he doesn't remember the

8 accident because he -- the accident caused him to blank

9 out.

10          Follow me?

11 A.        I understand.

12 Q.        Okay.

13 A.        I don't think he was able to differentiate.  He

14 just said he blanked out and the next thing he remembered

15 was looking at the front of the bus from the outside.

16          Now, we talked both about him falling asleep and

17 that causing the collision, but then we would also talk to

18 the memory loss coming from the injuries.

19 Q.        Now, you are, generally speaking, assigned to a

20 team that's involved in the accident reconstruction; fair

21 statement?

22 A.        Yes.

23 Q.        All right.  And one of the significant factors

24 in this particular accident reconstruction is the lack of

25 any evidence of braking.

1          Do you agree with that?

2          THE COURT:  Excuse me; lack of any evidence

3  of --

4          MR. SMITH:  Any braking.  Any braking on the

5  part of the bus.

6          THE WITNESS:  No.  We were not able to

7  determine -- there was no braking of the bus.

8          BY MR. SMITH:  Q.  And that's a significant

9  factor in your investigation?

10 A.        Yes.

11 Q.        A conscious driver might be expected to have

12 applied the brakes sometime during the process?

13 A.        Yes.

14         MR. SMITH:  You are a very careful witness,

15 Officer.

16         I have no further questions.

17         MR. POYNER:  Your Honor, I have one, if I may.

18                   REDIRECT EXAMINATION

19         BY MR. POYNER:  Q.  You were talking about when

20 you --

21         When I asked you and then Mr. Smith asked you if

22 it was a possibility that he fell asleep; could you turn

23 to page 485 of your report?

24         (Pause.)

25         MR. SMITH:  I continue to stipulate that the

1  officer can use the report to refresh his recollection,

2  Your Honor.

3            BY MR. POYNER:  Q.  Right about in the middle,

4  you asked the question:

5            "Is there a possibility that you fell

6            asleep?"

7            Do you see that?

8  A.        Page 445?

9  Q.        Four eighty-five.

10 A.        Oh, 485?  Okay.

11           (Pause.)

12           THE WITNESS:  Actually, I did not ask

13 that question.  I was there with another officer,

14 Investigator Luce.  He's the one who asked the question,

15 but I was right there when we were both conducting the

16 interview.

17           BY MR. POYNER:  Q.  You heard him ask the

18 question?

19 A.        Yes.

20 Q.        And the response?

21 A.        "It's a possibility."

22 Q.        There are more words than that there.

23 A.        "That's -- to me, that's what I believe

24           happened, because I mean, I had to be to

25           not know that the bus was swerving like

1          that.  And, you know, I had to be hella

2          tired, man."

3          MR. POYNER:  Thank you.  Nothing further --

4     well, excuse me, I do have something further.

5  Q.     We have a list of 25 people that suffered

6     injuries on this bus.

7          Did I hand that to you, Officer?

8  A.     Yes.

9  Q.     You are familiar with most of the names on this

10    list?

11 A.     Yes.

12 Q.     And the injuries they sustained?

13 A.     Yes.

14         MR. SMITH:  Your Honor, if it's of any

15    assistance, those names have been reviewed and

16    re-reviewed.  And counsel is prepared to stipulate that

17    the testimony would be that those individuals received

18    injuries in this collision that are consistent with great

19    bodily injury as defined in the Vehicle Code and the Penal

20    Code.

21         MR. POYNER:  I will accept the stipulation.

22         (Pause.)

23         THE COURT:  Well, the Court has been provided

24    with a list that has 25 names on it.  Are those the 25

25    people you are referring to?

1          MR. POYNER:  Yes.  I thought I said 25.

2          THE COURT:  I just wanted to make sure.

3          All right.  Your list has a higher number, but I

4  guess that it was modified.

5          How are you going to memorialize who these

6  people are?  Do you want to put that in evidence or

7  something?

8          MR. SMITH:  I am expecting the officer would

9  read the names, Your Honor.

10          THE COURT:  Okay.

11          BY MR. POYNER:  Q.  Officer, read the names.

12  A.          Okay.  Mia Xong Cha, Pa Cha, Yea Yang Cha, Jer

13  Chang, Ying Kha, Mai Lor Lee, Qer Lee, Xia Lo, Chee Moua,

14  Mai Thi Nga, Chan Poo Saechao, Choua Seng Saecho, Eian

15  Saechao, Maung Saecho, Chio Cho Saeteurn, Chong Tua Vang,

16  Chou Ma Vang, Houa Vang, Ia Vang, Khou Vang, Wang Ser

17  Vang, Ge Vue, Chong Cha Yang, Pai V. Yang, Shong Yang.

18          MR. POYNER:  Thank you.

19          MR. SMITH:  Could we also put on the record at

20  this time a further stipulation, Your Honor?

21          I think it appropriate at this time to put on

22  the record that the District Attorney has agreed not to

23  allege in the Information these particular allegations of

24  great bodily injury, but reserves the right to do so up

25  and through the date set, any date that's set for trial

1  confirmation in this matter.

2          And by that, I mean:  The Information will be

3  filed without these allegations, but the People have

4  reserved the right to file these allegations.

5          MR. POYNER:  That's my understanding.

6          THE COURT:  To trial readiness conference?

7          MR. POYNER:  That's my understanding.

8          THE COURT:  The stipulation is accepted and is

9  on the record.

10         MR. POYNER:  No further questions of this

11 witness, Your Honor.

12         THE COURT:  Mr. Smith, any cross?

13                   RECROSS-EXAMINATION

14         BY MR. SMITH:  Q.  Who was the officer that took

15 that particular statement?

16 A.       Officer George Luce.

17         MR. SMITH:  Thank you.  No further questions,

18 Your Honor.

19         (Pause.)

20         THE COURT:  You may step down.

21         Counsel, your next witness?

22         MR. POYNER:  Dave Markss.

23                   DAVID BRIAN MARKSS,

24 a witness called by the Plaintiff, after being first duly

25 sworn to state the truth, the whole truth and nothing but

PROOF OF SERVICE BY MAIL;

[C.C.P. §§ 1013, 2015.5; U.S.C. 28 §§ 1746]


STATE OF CALIFORNIA)

KERN COUNTY          )


I, ("A") _Quinton Watts_____ am a resident of the North Kern State Prison in Delano, Kern County, California, and I am at least 18 years of age. My mailing address is:

P.O BOX _5000_____, Delano, California 93216- _5000_

On ("B") _____ I served a true and correct copy of the following document(s):

("C") _42 USC 1983 Form )(4 pages of Mail Team documents)(One page of Legal arguments)(1 page of a Statement) 1 page from the Colusa-Sun-herald_____

to each party listed below by placing them in an envelope with adequate postage attached or provided for and by depositing said envelope in a box for UNITED STATES MAIL at the N.K.S.P., Delano address. _North Kern State prison / P.O. Box 5000 /Delano, Calif 93216_


This copy is being mailed to: _Clerk of the U.S. District Court_
_For The Eastern District of California_
_501 I street, Room 4-200_
_Sacramento, California 95814_


I have mailed additional copies to:




I declare under penalty of perjury that the foregoing is true and correct.

Dated this day of: _____ at North Kern State Prison

Signed: _____ CDCR I.D. # _____